# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 27 2016, 6:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE[1]

Eddy L. Buchanan
Carlisle, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Eddy L. Buchanan,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 27, 2016

Court of Appeals Case No.
18A05-1510-CR-1600

Appeal from the
Delaware Circuit Court

The Honorable
John M. Feick, Judge

Trial Court Cause No.
18C04-1201-FA-2

---

[1] Attorney Megan B. Quirk filed Appellant's Notice of Appeal, Brief, and Appendix, but she was thereafter granted leave to withdraw, and defendant Eddy L. Buchanan now proceeds pro se.

**Kirsch, Judge.**

[1] Following a bench trial, Eddy L. Buchanan ("Buchanan") was found guilty but mentally ill of having committed attempted murder,[2] a Class A felony, and criminal confinement as a Class B felony,[3] and he was adjudged to be a habitual offender.[4] Buchanan appeals, raising the following two restated issues:

> I. Whether there was sufficient evidence to support the trial court's rejection of Buchanan's insanity defense; and

> II. Whether the trial court properly sentenced Buchanan.

[2] We affirm.[5]

# Facts and Procedural History

[3] In January 2012, Buchanan, his wife Ashley[6] Chalfant ("Chalfant"), and Chalfant's three young children resided in a home in Muncie, Indiana. The oldest, D.F., was seven years old at that time. On the morning of January 4,

---

[2] *See* Ind. Code §§ 35-41-5-1, 35-42-1-1(1). We note that the statutes under which Buchanan was convicted were amended effective July 1, 2014; however, we apply the statutes that were in effect at the time he committed his offenses in January 2012.

[3] *See* Ind. Code §§ 35-42-3-3(a)(1) and 35-42-3-3(b)(2)(A).

[4] *See* Ind. Code §35-50-2-8.

[5] We note that Buchanan was also charged with and found guilty but mentally ill of having committed Class D felony domestic battery, but the trial court did not enter judgment of conviction on that conviction due to double jeopardy concerns.

[6] We note that the record contains two spellings, Ashley and Ashely. We will use the spelling found in the charging information, subpoena issued by the trial court, and transcript.

2012, Buchanan awoke Chalfant and instructed her not to send the kids to school that day. Chalfant was recuperating from having had back surgery in December 2011, and she went back to sleep for a while longer. After she got up, she and Buchanan argued, and he accused Chalfant of cheating on him with the landlord and told her to take a shower. She managed to shower, although had difficulty because of the recent back surgery, and then she made her way to the living room and sat on the couch with two of the children, including D.F. Buchanan and Chalfant continued to argue, and, at some point, Buchanan threw a weight at her. He then retrieved a butcher knife from the kitchen and stabbed Chalfant in the left arm. The children ran into a bedroom, and their mother screamed for help. Buchanan stabbed Chalfant at least five more times, while making statements to her such as "till death do us part" and telling Chalfant that she "shouldn't have cheated on him." *Tr*. at 64, 67-68. He also said that "he had two cousins that had killed their wives. And [she] was no different." *Id*. at 69. As Chalfant screamed to D.F. to get help, Buchanan yelled to D.F., "[I]f you come out here, you'll be laying on the ground like your mom." *Id*. at 93-94. At some point, D.F. needed to use the bathroom, so Buchanan covered D.F.'s head and walked him out of the bedroom and to the bathroom and back, while holding a knife to D.F.'s back.

[4] Buchanan moved a couch in front of the front door, to block entry or exit, and then he ingested a bottle of Valium and passed out on that couch. Chalfant was on another couch, bleeding profusely. Sometime after Buchanan was asleep or unconscious, D.F. came out of the bedroom and ran around the house trying to

find a phone. Eventually, D.F. kicked out a small playroom window – the only window in the house without bars on it – and climbed out. He waved down a vehicle, and the driver, later determined to be Mitchell Parks ("Parks"), stopped and spoke to D.F., who was scared and crying. Parks called 911 and waited until emergency vehicles arrived.

[5] Lieutenant Rick Eber ("Lieutenant Eber") of the Muncie Police Department arrived, along with other emergency personnel. From outside of the home, he heard Chalfant faintly say, "I'm stabbed all over, I'm dying." *Tr.* at 45. After talking to D.F. and learning Chalfant and Buchanan were both still inside, Lieutenant Eber kicked open the front door, because all doors were locked and the windows barred, except the one small one. The door was blocked by the couch, but police pushed it open and saw Buchanan lying on the couch, with Chalfant injured and bleeding on another couch. Lieutenant Eber heard Chalfant say, "Eddy stabbed me." *Id*. at 49.

[6] Chalfant was transported to the hospital, where physicians determined she had been stabbed at least six times, including wounds to the torso, upper left arm, and the right side of her back. Chalfant lost approximately half of her blood volume. She also sustained a fractured rib, laceration to the liver, puncture wound to her left lung, and puncture wound to the pericardium.

[7] The State charged Buchanan with Class A felony attempted murder, Class B felony criminal confinement, Class D felony domestic battery, and a habitual offender sentence enhancement. Prior to trial, Buchanan filed a Notice of

Defense of Mental Disease or Defect pursuant to Indiana Code section 35-41-3-6. The trial court appointed board-certified psychiatrist Dr. Rebecca Mueller ("Dr. Mueller") and licensed clinical psychologist Dr. Frank Krause ("Dr. Krause") to evaluate Buchanan and file a report with the trial court. In March 2012, Dr. Mueller filed her report, in which she rendered an opinion that Buchanan was not sane at the time of the offenses. Thereafter, in June 2012, Dr. Krause filed his report, rendering an opinion that Buchanan was sane. The three-day bench trial occurred in January 2015.

[8] At trial, both experts testified. In preparing her report, Dr. Mueller interviewed Buchanan at the jail and reviewed his psychiatric records from Ball Memorial/IU Health for the period of 2003-2011, which involved two hospitalizations. *State's Ex.* 38. She also reviewed Buchanan's incarceration records, which included information from the nursing staff, and she reviewed the current charging information and probable cause affidavit. *Id.* During her interview with Buchanan, he reported that he heard things in his cell that others did not hear and that he saw things that others told him did not actually occur. Her report emphasized such post-arrest psychosis, although Buchanan denied having any prior history of delusions and hallucinations. Buchanan reported to Dr. Mueller that his mother suffered from schizophrenia and that his maternal uncles did, too. Dr. Mueller's ultimate diagnosis of Buchanan was "Schizoaffective, Depressed type," noting "Of importance is the positive correlation of his first degree family member having thought disorders across the spectrum." *Id.* Dr. Mueller concluded that Buchanan suffered from a

mental disease or defect such that he was unable to appreciate the wrongfulness of his conduct when he committed the crimes. *Id.*; *Tr.* at 175.

[9]     Dr. Krause's evaluation included a review of documents and videos, as well as an interview, a medical history, psychological testing, and a substance abuse screening. *State's Ex.* 40. During the interview portion of the evaluation, Buchanan told Dr. Krause that he had been off his medication and was suicidal. He reported that he and his wife had been arguing on the morning in question and that he stabbed her, and he also reporting putting the couch in front of the door. He denied experiencing any hallucinations or delusions. Dr. Krause administered the Personality Assessment Inventory ("PAI") to Buchanan, and Dr. Krause's report stated that "[Buchanan's] responses suggest that he is an individual who is easily angered, has difficulty controlling the expression of his anger, and is perceived by others as having a hostile, angry temperament." *Id.* Dr. Krause also found in his report that Buchanan tended to portray himself in a negative or pathological manner, and "Some deliberate distortion of the clinical picture may be present." *Id.* Based on the PAI results, along with other matters assessed during the evaluation, including prior history of antisocial personality disorder, Dr. Krause diagnosed Buchanan as "malingering," which Dr. Krause described as when a person feigns a mental illness or reports exaggerated symptoms and conditions. *Id.* Dr. Krause's ultimate diagnosis was: Bipolar II Disorder; Intermittent Explosive Disorder; Malingering; and Borderline Personality Disorder. *Id.* Dr. Krause concluded that, although Buchanan has these mental illnesses, Buchanan did not suffer from a mental

condition that grossly and demonstrably impaired his perception and that Buchanan was able to appreciate the wrongfulness of this actions on January 4, 2012. *Id*.; *Tr*. at 281-82.

[10] The State presented other witnesses, including police officers and Chalfant. Thereafter, Buchanan testified in his defense. He testified to suffering from bipolar disorder and post-traumatic stress syndrome ("PTSD") and to having attempted suicide in December 2011. Following that attempt, he was in Ball Memorial Hospital's "psych ward" for a couple of weeks, until being released on December 24, 2011. *Tr*. at 147. When asked about the stabbing incident on January 4, 2012, Buchanan testified, "I don't remember any of it at all." *Id.* In fact, he had no recollection of any of the day's events, including waking up or being in the hospital after the incident.

[11] Both parties submitted proposed findings of fact and conclusions of law thereon to the trial court, and, on July 20, 2015, the trial court issued its Findings of Fact, Conclusions of Law, and Judgment of Conviction ("Order"), finding Buchanan guilty but mentally ill on all counts, and it adjudicated him to be a habitual offender.[7] In reaching its guilty-but-mentally-ill decision, the trial court recognized that it was presented with conflicting expert opinions, and it accepted Dr. Krause's expert opinion, while finding Dr. Mueller's to be not credible. The trial court explained in detail certain aspects of Dr. Mueller's

---

[7] We note that the trial court's thoroughness in its Findings of Fact, Conclusions of Law, and Judgment of Conviction, which was thirty-three pages in length, aided our appellate review.

evaluation, report, and testimony that caused it to find her opinion and conclusion not credible. Those included the following matters: First, Dr. Mueller's report emphasized Buchanan's self-report of post-arrest hallucinations in his jail cell. However, after she filed her report, she viewed Buchanan's videotaped interrogation with Detective Jami Brown, which occurred four days after the incident. After viewing it, she noted in the margin of her report that Buchanan's psychosis "now N/A given investigator interview[,]" where Buchanan did not mention any hallucinations to the investigator having occurred, either at the time of the offense or after arrest. *State Ex.* 38. The trial court found that Dr. Mueller's note "calls into question and casts doubt upon [Buchanan's] self-report of post arrest hallucinations." *Appellant's App.* at 254.

[12] Second, the trial court observed that Dr. Mueller's report and opinion rested "entirely on the self-report of [Buchanan.]" *Id*. at 255. That is, her diagnosis of "Schizoaffective, Depressed Type" was based, in part, on Buchanan's report of a family history, specifically he told her that his mother and maternal uncles suffered from schizophrenia. *State's Ex*. 38. The trial court observed that Dr. Mueller "took no steps to corroborate this information." *Appellant's App*. at 255. Further, the trial court recognized that Buchanan's reported family history was inconsistent with that which he told Dr. Krause, as Buchanan initially denied any family history to Dr. Krause and later told Dr. Krause that his mother and aunts suffered from schizophrenia. Therefore, the trial court found, Buchanan gave "three completely different and contradictory reports on family history: none, mother and aunts, and mother and uncles." *Id*. The trial court

was troubled that, while Dr. Mueller had indicated that the family history was "[o]f importance" in reaching her ultimate opinion, she did not take steps to corroborate what Buchanan had told her. *Id.*; *State's Ex.* 38.

[13] Third, the trial court noted that while "mental disease or defect" is defined by law, Dr. Mueller on cross-examination was not able to accurately state the appropriate definition of the phrase as it relates to the defense of insanity and her opinion of that. The trial court found that Dr. Mueller's definition of mental disease or defect, which relied on the Diagnostic and Statistical Manual ("DSM") "is not only incorrect, it is much broader than the statutory definition" because it includes many mental diseases, such as personality disorders, depression, anorexia, and others "that do not fall within the very narrow definition of 'mental disease or defect' as it relates to the insanity statu[t]e." *Appellant's App*. at 257-58. Because of her "unfamiliarity with this fundamental and crucial definition," the trial found that her opinion that Buchanan, because of mental disease or defect, was unable to appreciate the wrongfulness of his conduct at the time of his offense was "called into question." *Id*. at 258.

[14] Fourth, the trial court observed that, even if it were to accept Dr. Mueller's opinion that Buchanan suffered from Schizoaffective Disorder on the date in question, she "did not offer any explanation as to how that disorder is in any way connected to [Buchanan's] ability to appreciate the wrongfulness of his actions" or how that disorder impaired Buchanan's perception of reality on the day of the stabbing, noting that there was no evidence presented that Buchanan

suffered from hallucinations or delusions on the day of the stabbing or any time prior thereto. *Id.* at 259.

[15] In addition to explaining its reasons for discounting Dr. Mueller's opinion and conclusions, the trial court cited to other non-expert "demeanor-type evidence" that supported Dr. Krause's conclusion that Buchanan did appreciate the wrongfulness of his conduct on the day in question. *Id.* at 264. For instance, evidence was presented that Buchanan was angry on the day in question, accusing Chalfant of having had sex with another man and ordering her to take a shower. Chalfant complained about the water being cold, and she could not adjust it herself due to the recent back surgery, and Buchanan became angrier. They argued in the living room, where Chalfant accused him of taking money from her purse, and Buchanan got a weight from another room and threw it at her. He thereafter began stabbing her. He made statements during the stabbing such as "till death do us part," reminding Chalfant of her wedding vows. He told her that he had cousins "who killed their wives, and they got away with it," demonstrating that he knew killing someone was wrong. *Id.* at 265; *Tr.* at 69. He also covered D.F.'s head when he walked D.F. to the restroom and back to the bedroom, thereby shielding him from seeing what Buchanan had done to D.F's mother, which the trial court viewed as an indication that Buchanan recognized the wrongfulness of his actions.

[16] In addition, the trial court's Order also found that Buchanan's testimony was "not credible." *Appellant's App.* at 262. Although Buchanan testified at trial to having no recollection whatsoever of the events of January 4, 2012, when he

met with Dr. Mueller on March 12, 2012, he recalled and related details of the January 4 morning, including that he made a steak-and-eggs breakfast for Chalfant, there was a steak knife on her plate, and they may have had a "knife fight." *State Ex*. 38. Similarly, Buchanan, when he met with Dr. Krause on May 25, 2012, related details of the January 4 morning, including that he was off his medication on January 4, he and Chalfant argued, he stabbed her, and he put a couch in front of the door. Also, during the January 8, 2012 interview with police, Buchanan stated that he and Chalfant argued about her having an extramarital affair, he swung a knife at her, he took pills because he wanted to die with Chalfant. The trial court found that Buchanan was "feigning memory loss because he believes it is in his best interest to do so[,]" and the "feigned memory loss is simply more evidence of malingering." *Id*.

[17] The trial court ultimately concluded that Buchanan failed to prove that he was legally insane at the time of the offense. However, the trial court concluded that Buchanan was guilty but mentally ill of the charged offenses, and it thereafter adjudicated him a habitual offender. At the subsequent sentencing hearing, the trial court identified aggravating factors, which included: (1) Buchanan had a history of criminal activity; (2) he violated the conditions of parole when he committed the instant crimes; (3) Buchanan exercised a degree of care and planning in the commission of the crimes as evidenced by having the children stay home from school and, after he stabbed Chalfant, barricading the door so that no one could help her; (4) the harm, injury, loss, or damage suffered by Chalfant was significant and greater than the elements necessary to

prove the commission of the offenses; (5) there were three prior attempts at rehabilitation through supervised probation, parole, and incarceration that were unsuccessful; (6) the facts of the instant case "are particularly disturbing"; and (7) there appears to be a distinct pattern or similarity indicated by the violent nature of Buchanan's past criminal history. *Tr.* 315-16. The trial court also identified mitigating circumstances that included: (1) Buchanan had "some family backing and support"; (2) his "apparent repentant attitude"; (3) there may have been mental vagaries in Buchanan's reasoning, which he thought tended to justify his actions, though they failed to rise to the level of a defense; and (4) he acknowledged financial responsibility and a willingness to make restitution to Chalfant. *Id.* at 316-17.

[18] After finding that the aggravating factors outweighed the mitigating ones, the trial court imposed a sentence of forty years executed for attempted murder and twenty years executed for criminal confinement, to be served concurrently. *Appellant's App.* at 274. The trial court enhanced Buchanan's forty-year sentence by thirty years for being a habitual offender, for a total sentence of seventy years, to be served at a "correctional facility that offers some sort of treatment or counseling to address his mental issues." *Tr.* at 317. Buchanan now appeals.

# Discussion and Decision

## I. Insanity Defense

[19] Even when the State proves every element of a charged offense beyond a reasonable doubt, a defendant can avoid criminal responsibility for that offense by raising and proving an insanity defense. *Galloway v. State,* 938 N.E.2d 699, 708 (Ind. 2010); *Lawson v. State*, 966 N.E.2d 1273, 1278-79 (Ind. Ct. App. 2012), *trans. denied*. Indiana Code Section 35-41-3-6 states:

> (a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.
>
> (b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

Mental illness alone is not sufficient to relieve a defendant from criminal responsibility. *Galloway*, 938 N.E.2d at 708. Rather, a defendant must establish both that he suffers from a mental illness and that this mental illness rendered him unable to appreciate the wrongfulness of his conduct at the time of the offense. *Id*. A defendant bears the burden of proving the insanity defense by a preponderance of the evidence. *Id*. A defendant who is mentally ill, but fails to establish that he or she was unable to appreciate the wrongfulness of his or her conduct, may be found guilty but mentally ill. *Id*. As this court has observed,

"[W]hile, all too often, horrific acts are irrational, this does not mean that the perpetrator of those acts must be legally insane." *Fernbach v. State*, 954 N.E.2d 1080, 1087 (Ind. Ct. App. 2011), *trans. denied*.

[20] Buchanan asserts that the trial court erred when it rejected his insanity defense and, instead, found him guilty but mentally ill. Because Buchanan bore the burden of establishing his insanity defense, he is now appealing from a negative judgment. When reviewing a negative judgment, this court will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even if more reasonable inferences arguably could have been made. *Lawson*, 966 N.E.2d at 1279. A defendant appealing a rejection of his or her insanity defense must demonstrate that the evidence is without conflict and leads only to the conclusion that he or she was insane when the crime was committed. *Id*.

[21] The question of whether a defendant appreciated the wrongfulness of his conduct at the time of the offense is a question of fact for the fact-finder to determine. *Galloway*, 938 N.E.2d at 709. Although Indiana Code Section 35-36-2-2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity, the trier of fact has extremely wide latitude and such expert testimony is merely advisory. *Id.* Our courts have recognized, "When mental health experts who have examined a defendant offer conflicting opinions on whether a defendant was insane at the time of the offense, i.e. where one or more experts testify that the defendant was insane while others testify that he or she was sane, such conflicting testimony generally

'is sufficiently probative of sanity.'" *Lawson*, 966 N.E.2d at 1273 (citing *Galloway*, 938 N.E.2d at 710).

[22] Here, the trial court was presented with conflicting expert opinions as to whether Buchanan appreciated the wrongfulness of his conduct on January 4, 2012. Buchanan essentially argues that the trial court should have accepted Dr. Mueller's opinion of insanity over Dr. Krause's opinion of sanity. However, we cannot reweigh the testimony of the experts or reassess credibility. *Lawson*, 966 N.E.2d at 1280-81. Thus, here, the trial court as the fact-finder was free to credit Dr. Krause's opinion over Dr. Mueller's. *See Lawson*, 966 N.E.2d at 1281 (jury was free to credit one doctor's opinion that defendant was sane over other doctor's opinion that defendant was insane when he committed crimes).

[23] We observe that, even if the experts had agreed that Buchanan was insane, our Supreme Court has held that "even unanimous expert testimony is not conclusive on the issue of sanity." *Galloway*, 938 N.E.2d at 709; *Fernbach,* 954 N.E.2d at 1086 (finding it was reasonable for jury to disregard insanity opinions of expert witnesses), *trans. denied.* That is, a fact-finder may still reject an insanity defense if there is "other evidence of probative value from which a conflicting inference of sanity can be drawn." *Galloway*, 938 N.E.2d at 712. Such evidence may include "demeanor evidence that, when considered in light of the other evidence, permits a reasonable inference of sanity to be drawn." *Id.* In this case, the trial court explained that it considered not only the experts' reports and testimony, but also demeanor evidence, which it found corroborated a finding of sanity. In its Order, the trial court reviewed the

events of the morning of January 4, which included Buchanan's concern and accusation that Chalfant had engaged an extramarital affair, his ordering her to shower because "he thought [she'd] been with somebody that night," their ensuing argument, his first throwing a weight at her, then stabbing her. *Tr.* at 59. The trial court also noted that Buchanan made statements to Chalfant that indicated he appreciated the wrongfulness of his actions, such as telling her his two cousins "got away" with killing their wives, and Buchanan covered D.F.'s head so he would not see what Buchanan had done to her. *Id.* at 69. From the events of the morning, the trial court inferred that Buchanan "attacked [] Chalfant out of anger and revenge." *Appellant's Br.* at 266.

[24] Here, Dr. Krause's report and testimony was probative evidence that Buchanan was sane when he committed his crimes, which alone "is sufficiently probative of sanity," despite its conflict with Dr. Mueller's opinion that he was insane. *See Galloway*, 938 N.E.2d at 710. Additionally, lay witness testimony was presented, including Chalfant's and D.F.'s, that corroborated the opinion that Buchanan was sane. Accordingly, Buchanan has failed to establish that the evidence is without conflict and leads only to the conclusion that he was insane when the crime was committed.

## II. Sentencing

[25] Following a sentencing hearing, the trial court entered a written sentencing order ("Sentencing Order"), and in it the trial court identified aggravating and mitigating circumstances. Finding that the aggravators outweighed the

mitigators, the trial court sentenced Buchanan to forty years on the attempted murder conviction, which the trial court enhanced by thirty years for the habitual offender adjudication, for a total of seventy years on the attempted murder conviction. As to the Class B felony criminal confinement conviction, the trial court imposed twenty years, to be served concurrently with the attempted murder conviction.

[26] As long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Anglemyer v. State,* 868 N.E.2d 482, 490 (Ind. 2007), *aff'd on reh'g,* 875 N.E.2d 218 (Ind. 2007). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* Examples of ways in which a trial court may abuse its discretion include: (1) failing to enter a sentencing statement; (2) entering a sentencing statement that explains reasons for imposing the sentence but the record does not support the reasons; (3) the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration; or (4) the reasons given in the sentencing statement are improper as a matter of law. *Kimbrough v. State*, 979 N.E.2d 625, 628 (Ind. 2012). However,

> [b]ecause the trial court no longer has any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, a trial court cannot now be said to have abused its discretion by failing to properly weigh such factors. This is so because once the trial court has entered a sentencing statement, which may or may not include the existence of aggravating and mitigating factors, it may then impose any

sentence that is authorized by statute and permitted under the Indiana Constitution.

*Sharkey v. State*, 967 N.E.2d 1074, 1078 (Ind. Ct. App. 2012) (internal citations omitted).

[27] Although a trial court may have acted within its lawful discretion in determining a sentence, Appellate Rule 7(B) provides that the appellate court may revise a sentence authorized by statute if the appellate court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Id.* "It is on this basis alone that a criminal defendant may now challenge his sentence where the trial court has entered a sentencing statement that includes a reasonably detailed recitation of its reasons for imposing the particular sentence that is supported by the record, and the reasons are not improper as a matter of law." *Id.*

[28] On appeal, Buchanan argues that the sentence imposed was "inappropriate," asserting that the trial court did not consider Buchanan's "inability to control his behavior due to his disorder/impairment" or "any limitation of his functioning," as well as "the duration of his mental illness[.]" *Appellant's Br.* at 15. Although claiming generally that the sentence is "inappropriate," Buchanan does not challenge his sentence with respect to his character or the nature of his offense. He has therefore waived any argument that his sentence is inappropriate. Ind. App. Rule 46(A)(8); *Allen v. State*, 875 N.E.2d 783, 788 n.8 (Ind. Ct. App. 2007).

[29] To the extent that Buchanan's claim is that the trial court abused its discretion because it failed to consider as a mitigator that he suffered from a mental illness, we reject that claim. The trial court expressly identified the following as a mitigating circumstance:

> There may tend to be mental vagaries[] in [Buchanan's] reasoning, which he thought tended to justify his actions, though they failed to rise to the level of a defense.

*Appellant's App.* at 274; *Tr.* at 316. The Sentencing Order further expressly addressed Buchanan's mental health issues by recommending that "[Buchanan] be placed in a correctional facility which offers some sort of treatment or counseling to address [his] mental health issues." *Appellant's App.* at 274. Thus, the record before us reflects that, when sentencing Buchanan, the trial court recognized and considered that Buchanan suffered from one or more mental illnesses.

[30] To the extent that Buchanan contends that the trial court should have afforded his mental disease or defect more weight than it did, we reject that claim as well. A trial court no longer has any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, and, therefore, a trial court cannot now be said to have abused its discretion by failing to properly weigh such factors. *See Richardson v. State*, 906 N.E.2d 241, 246 (Ind. Ct. App. 2009) (weight trial court gives to mitigating factors is not subject to appellate review). Accordingly, Buchanan has failed to establish either that his

sentence was inappropriate or that the trial court abused its discretion when it sentenced him.

[31] Affirmed.

[32] Riley, J., and Pyle, J., concur.